# UNITED STATES DISTRICT COURT
# MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| CHARLES WILLIAM PEARSON, JR., | |
| Plaintiff, | CIVIL ACTION NO. 3:19-CV-00973 |
| v. | (MEHALCHICK, M.J.) |
| ANDREW SAUL,<br>Commissioner of Social Security, | |
| Defendant. | |

## MEMORANDUM OPINION

Nearly nine years ago, Plaintiff Charles Pearson, Jr. ("Pearson") first sought disability benefits, and now, for the third time, seeks review of the denial of those benefits. Pearson brings this action under Section 205(g) of the Social Security Act, 42 U.S.C. §405(g), for judicial review of the final decision of the Commissioner of Social Security (the "Commissioner") denying his application for disability insurance benefits under Title II of the Social Security Act. For the following reasons, the undersigned shall order the Commissioner's decision be **REVERSED** and the claimant be **AWARDED BENEFITS**.

## I. BACKGROUND AND PROCEDURAL HISTORY

This action began as a simple application filed by Pearson on November 7, 2011, for Disability Insurance Benefits under Title II of the Social Security Act. Since that date, Pearson's claim has bounced between this Court and the Social Security Administration several times. This is now the third time that Pearson has sought review in this Court.

On November 7, 2011, Pearson protectively filed a Title II application for SSI alleging a disability onset date of June 30, 2011. (Doc. 8-6, at 2-8). In his application, Pearson alleges he is disabled due to narcolepsy. (Doc. 8-7, at 6). Pearson was born on June 30, 1953 and was

fifty-eight years old on the alleged disability onset date.[1] (Doc. 8-6, at 2).

On February 13, 2012, Pearson's claim was denied at the initial level of administrative review. (Doc. 8-4, at 2-10). Pearson filed a timely request for a hearing before an administrative law judge ("ALJ") on February 29, 2012, and on November 21, 2012, Pearson appeared and testified at an administrative hearing before ALJ Daniel Myers ("ALJ Myers"). (Doc. 8-2, at 65-91; Doc. 8-5, at 6-7). ALJ Myers denied Pearson's claim in a written decision dated February 12, 2013, in which he concluded that Pearson was unable to perform any of his past relevant work, but that he was capable of adjusting to a full range of work with the nonexertional limitations of no hazards and no driving. (Doc. 8-2, at 55, 58). Pearson requested review of ALJ Myers's decision by the Appeals Council of the Office of Disability Adjudication and Review ("Appeals Council"), but the Appeals Council denied his request. (Doc. 8-2, at 2-6).

Pearson filed a complaint in this court on July 22, 2014. (Doc. 8-11, at 24-35). On May 22, 2015, the Commissioner filed a Motion for Remand. (Doc. 8-11, at 36-42). The Commissioner concluded that the case would benefit by further evaluation of the record and re-evaluation of Pearson's claim for disability. (Doc. 8-11, at 37). On October 13, 2015, the Appeals Council vacated ALJ Myers's decision and remanded the case. (Doc. 8-11, at 43-48).

On remand, Pearson again appeared and testified before ALJ Myers, this time on February 12, 2016. (Doc. 8-10, at 28-52). In a written decision dated March 18, 2016, ALJ Richard Guida ("ALJ Guida") denied Pearson's claim. (Doc. 8-10, at 13-22). ALJ Guida

---

[1] At the time of Pearson's alleged onset date of disability, he was considered an individual of "advanced age," according to the regulations promulgated under the authority of the Act. See 20 C.F.R. § 404.1563(e) ("We consider that at advanced age (age 55 or older), age significantly affects a person's ability to adjust to other work.)

determined that Pearson could not only return to all of his past relevant positions, but that Pearson was also capable of performing other jobs in the national economy. (Doc. 8-10, at 21-22). ALJ Guida found that Pearson was capable of adjusting to a full range of work with the nonexertional limitation of avoiding concentrated exposure to hazards. (Doc. 8-10, at 18). On April 15, 2016, Pearson requested that the Appeals Council review ALJ Guida's decision, and filed exceptions along with his review request. (Doc. 8-13, at 2-9). The Appeals Council denied Pearson's request for review on September 28, 2016, thus affirming ALJ Guida's March 18, 2016 decision. (Doc. 8-10, at 2-7).

On November 18, 2016, Pearson initiated his second action in this Court. (Doc. 8-18, at 34). In a report and recommendation adopted by the District Court on May 16, 2018, the undersigned determined that ALJ Guida had failed to adhere to the Appeals Council's remand order. (Doc. 8-18, at 44). This Court found that ALJ Guida (1) failed to explain why he concluded that Dr. Michalek's December 2012 opinion contained no physical examination or diagnostic testing by the Neurology Center noting any objective medical abnormalities, especially considering that Dr. Michalek referred Pearson to Christopher Royer ("Dr. Royer") for diagnostic testing; and (2) did not address Dr. Michalek's opinion that Pearson required intermittent naps during working hours for his safety due to his narcolepsy, and that he exhibited a poor response to medication. (Doc. 8-18, at 44). The Court determined that ALJ Guida's opinion was not supported by substantial evidence and remanded the case for further proceedings. (Doc. 8-18, at 45).

Once again, Pearson appeared before ALJ Guida, this time on December 17, 2018. (Doc. 8-17, at 41). In a written opinion dated February 8, 2019, ALJ Guida again ruled that Pearson was capable of returning to past relevant work in addition to performing other jobs

in the national economy. (Doc. 8-17, at 15-16). As in his prior ruling, ALJ Guida found that Pearson was capable of performing a full range of work at all exertional levels with the only nonexertional limitation of avoiding concentrated exposure to hazards. (Doc. 8-17, at 10). After the Appeals Council declined to review Pearson's case, the instant action was initiated on June 6, 2019. (Doc. 1; Doc. 8-17, at 34-35). The Commissioner responded on September 4, 2019, providing the requisite transcripts from Pearson's disability proceedings. (Doc. 7; Doc. 8). The parties then filed their respective briefs, with Pearson raising four bases for reversal or remand. (Doc. 11, at 3-4; Doc. 15; Doc. 18).

## II.   STANDARDS OF REVIEW

To receive benefits under Title II of the Social Security Act, a claimant must demonstrate an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). To satisfy this requirement, a claimant must have a severe physical or mental impairment that makes it impossible to do his or her previous work or any other substantial gainful activity that exists in significant numbers in the national economy. 42 U.S.C. § 423(d)(2)(A); 20 C.F.R. § 404.1505(a).[2] Additionally, a claimant must be insured for disability insurance benefits. 42 U.S.C. § 423(a)(1)(a); 20 C.F.R. § 404.131.

### A.   ADMINISTRATIVE REVIEW

In evaluating whether a claimant is disabled, the "Social Security Administration,

---

[2] A "physical or mental impairment" is defined as an impairment resulting from "anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. § 423(d)(3).

working through ALJs, decides whether a claimant is disabled by following a now familiar five-step analysis." *Hess v. Comm'r Soc. Sec.*, 931 F.3d 198, 200–01 (3d Cir. 2019). The "burden of proof is on the claimant at all steps except step five, where the burden is on the Commissioner of Social Security." *Hess*, 931 F.3d at 201; 20 C.F.R. § 404.1512(a)(1). Thus, if the claimant establishes an inability to do past relevant work at step four, the burden shifts to the Commissioner at step five to show that jobs exist in significant numbers in the national economy that the claimant could perform consistent with his or her residual functional capacity, age, education, and past work experience. 20 C.F.R. § 404.1512(a)(1).

B.   JUDICIAL REVIEW

The Court's review of a determination denying an application for benefits is limited "to considering whether the factual findings are supported by substantial evidence." *Katz v. Comm'r Soc. Sec.*, No. 19-1268, 2019 WL 6998150, at *1 (3d Cir. Dec. 20, 2019). Substantial evidence "does not mean a large or considerable amount of evidence, but rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Pierce v. Underwood*, 487 U.S. 552, 565 (1988) (internal quotation marks omitted). Substantial evidence is less than a preponderance of the evidence but more than a mere scintilla. *Richardson v. Perales*, 402 U.S. 389, 401 (1971).

A single piece of evidence is not substantial if the ALJ ignores countervailing evidence or fails to resolve a conflict created by such evidence. *Mason v. Shalala*, 994 F.2d 1058, 1064 (3d Cir. 1993). In an adequately developed factual record, substantial evidence may be "something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent [the ALJ's decision] from being supported by substantial evidence." *Consolo v. Fed. Maritime Comm'n*, 383 U.S. 607, 620

(1966). "In determining if the Commissioner's decision is supported by substantial evidence the court must scrutinize the record as a whole." *Leslie v. Barnhart*, 304 F. Supp. 2d 623, 627 (M.D. Pa. 2003).

The question before the Court, therefore, is not whether Pearson is disabled, but whether the Commissioner's determination that Pearson is not disabled is supported by substantial evidence and was reached based upon a correct application of the relevant law. *See Arnold v. Colvin*, No. 3:12-CV-02417, 2014 WL 940205, at *1 (M.D. Pa. Mar. 11, 2014) ("[I]t has been held that an ALJ's errors of law denote a lack of substantial evidence."); *Burton v. Schweiker*, 512 F. Supp. 913, 914 (W.D. Pa. 1981) ("The [Commissioner]'s determination as to the status of a claim requires the correct application of the law to the facts."); *see also Wright v. Sullivan*, 900 F.2d 675, 678 (3d Cir. 1990) (noting that the scope of review on legal matters is plenary). "In determining if the Commissioner's decision is supported by substantial evidence the court must scrutinize the record as a whole." *Leslie v. Barnhart*, 304 F. Supp. 2d 623, 627 (M.D. Pa. 2003). If "the ALJ's findings of fact . . . are supported by substantial evidence in the record," the Court is bound by those findings. *Knepp v. Apfel*, 204 F.3d 78, 83 (3d Cir. 2000).

### III.   THE ALJ'S DECISION[3]

In his written decision, the ALJ determined that "[Pearson] has not been under a disability, as defined in the Social Security Act, from June 30, 2011, through the date of this decision . . . ." (Doc. 8-17, at 17). Further, the ALJ determined that Pearson was capable of performing a full range of work at all exertional levels with the nonexertional limitation of

---

[3] At the outset, the ALJ determined that Pearson met the insured status requirements of the Social Security Act through March 31, 2019. (Doc. 8-17, at 7).

avoiding concentrated exposure to hazards. (Doc. 8-17, at 10). The ALJ reached this conclusion after proceeding through the five-step sequential analysis required by the Social Security Act. *See* 20 C.F.R. § 404.1520(a)(4).

A.  STEP ONE

At step one of the five-step analysis, the ALJ must determine whether the claimant is engaging in substantial gainful activity ("SGA"). 20 C.F.R. § 404.1520(a)(4)(i). If a claimant is engaging in SGA, the claimant is not disabled, regardless of age, education, or work experience. SGA is defined as work activity requiring significant physical or mental activity and resulting in pay or profit. 20 C.F.R. § 404.1520(b). In making this determination, the ALJ must consider only the earnings of the claimant. 20 C.F.R. § 404.1574.

Here, the ALJ determined that Pearson engaged in SGA from July 2014 through June 2015. (Doc. 8-17, at 7). The ALJ's analysis concerning the time periods of which Pearson did not engage in SGA proceeded to step two.

B.  STEP TWO

At step two, the ALJ must determine whether the claimant has a medically determinable impairment, or combination of impairments, that is severe and meets the 12-month duration requirement. 20 C.F.R. § 404.1520(a)(4)(ii). If the ALJ determines that the claimant does not have an impairment or combination of impairments that significantly limits his or her "physical or mental ability to do basic work activities," the ALJ will find that the claimant does not have a severe impairment and is therefore not disabled. 20 C.F.R. § 404.1520(c). If a claimant establishes a severe impairment or combination of impairments, the ALJ analysis continues to the third step.

Here, the ALJ concluded that Pearson had one severe impairment:

narcolepsy/obstructive sleep apnea. (Doc. 8-17, at 7).

C.   STEP THREE

At step three, the ALJ must determine whether the severe impairment or combination of impairments meets or equals the medical equivalent of an impairment listed in the version of 20 C.F.R. Part 404, Subpt. P, App. 1 that was in effect on the date of the ALJ's decision. 20 C.F.R. § 404.1520(a)(4)(iii). The sections in this appendix are commonly referred to as "listings." If the ALJ determines that the claimant's impairments meet these listings, then the claimant is considered disabled. 20 C.F.R. § 404.1520(d).

After considering listing 3.10 – sleep-related breathing disorders - the ALJ determined that Pearson's impairment did not meet or equal the severity of a listed impairment. (Doc. 8-17, at 10) (citing 20 C.F.R. Part 404, Subpt. P, App. 1 § 3.10).

D.   RESIDUAL FUNCTIONAL CAPACITY

Between steps three and four, the ALJ determines the claimant's residual functional capacity ("RFC"), crafted upon consideration of the evidence presented. At this intermediate step, the ALJ considers "all [the claimant's] symptoms . . . and the extent to which [the claimant's] symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence." 20 C.F.R. § 404.1529(a). This involves a two-step inquiry where the ALJ must (1) determine whether an underlying medically determinable mental impairment or impairments could reasonably be expected to produce the claimant's symptoms and, if so, (2) evaluate the intensity, persistence, and limiting effects of the claimant's symptoms to determine the extent to which they limit the claimant's functional limitations. *See* 20 C.F.R. § 404.1529(b)–(c).

Here, based on his consideration of the medical opinions and other relevant evidence

in the record, the ALJ determined that Pearson had the RFC to perform a full range of work at all exertional levels but with the nonexertional limitation of avoiding concentrated exposure to hazards. (Doc. 8-17, at 10).

E. STEP FOUR

Having assessed a claimant's RFC, step four requires the ALJ to determine whether the claimant has the RFC to perform the requirements of his or her past relevant work. 20 C.F.R. § 404.1520(a)(4)(iv). A finding that the claimant can still perform past relevant work requires a determination that the claimant is not disabled. 20 C.F.R. § 404.1520(a)(4)(iv). Past relevant work is defined as work that the claimant has done within the past 15 years, that was substantial gainful activity, and that lasted long enough for the claimant to learn how to do it. 20 C.F.R. §§ 404.1560(b). "If the claimant can perform [his] past relevant work despite [his] limitations, he is not disabled." *Hess*, 931 F.3d at 202 (citing 20 C.F.R. § 404.1520(a)(4)(iv)).

Here, the ALJ found that Pearson was capable of performing his past relevant work of cashier, cleaner, and project manager. (Doc. 8-17, at 15). Though not required, the ALJ proceeded to step five. (Doc. 8-17, at 15).

F. STEP FIVE

At step five of the sequential analysis process, the ALJ considers the claimant's age, education, and work experience to see if a claimant can make the adjustment to other work. 20 C.F.R. § 404.1520(a)(4)(v). These factors are not considered when evaluating a claimant's ability to perform past relevant work. 20 C.F.R. § 404.1560(b)(3). If a claimant can adjust to other work, he or she will not be considered disabled. 20 C.F.R. § 404.1520(a)(4)(v).

In his step-five analysis, the ALJ determined that Pearson was 58 years old on the

alleged onset date, defined as an individual of advanced age as set forth by 20 C.F.R. §
404.1563, and has "at least a high school education and is able to communicate in English"
as considered in 20 C.F.R. § 404.1564. (Doc. 8-17, at 15). The ALJ determined that upon
consideration of these factors, Pearson's RFC, and the testimony of a vocational expert,
"there are other jobs existing in the national economy that [Pearson] can also perform." (Doc.
8-17, at 15). The ALJ specifically identified occupations of day worker, food service worker,
and bagger. (Doc. 8-17, at 16).

Concluding his analysis, the ALJ determined that Pearson was not disabled from June
30, 2011, through the date of the decision and denied his applications for benefits. (Doc. 8-
17, at 17).

## IV. DISCUSSION

Pearson advances five arguments on appeal: (1) that ALJ Guida again failed to follow
the remand directives of this Court and of the Appeals Council; (2) that ALJ Guida erred in
giving greater weight to agency consultants than to Pearson's treating providers; (3) that ALJ
Guida erred in unreasonably discounting the testimony of Mr. and Mrs. Pearson; (4) that ALJ
Guida erred in considering Pearson's failed work attempts as evidence that he could work;
and (5) that ALJ Guida failed to consider Pearson's eligibility for a closed period of disability
benefits. (Doc. 11, at 3-4).

### A. ALJ GUIDA ERRED IN NOT ABIDING BY THE COURT'S MOST RECENT REMAND ORDER.

First, Pearson submits that ALJ Guida, in his written opinion, failed to follow the
directions of the Appeals Council's most recent remand order issued on September 6, 2018,
to proceed consistent with the order of this Court. (Doc. 11, at 4-7). Defendant asserts that
ALJ Guida was permitted to conduct a *de novo* review of the case following remand by the

Court. (Doc. 15, at 20).

Upon remand the Secretary must follow the directive of the Court which issued the remand. *Sullivan v. Hudson*, 490 U.S. 877, 886 (1989). When a district court gives instructions as to "the scope of the remand, the evidence to be adduced, and the legal or factual issues to be addressed," the Secretary's "deviation from the court's remand order in the subsequent administrative proceedings is itself legal error, subject to reversal on further review." *Sullivan*, 490 U.S. at 886. Prior ALJ decisions, however, are not binding on subsequent ALJ's, especially if additional evidence is heard. *See Carter v. Barnhart*, 133 F. App'x 33, 35 (3d Cir. 2005).

The order of this Court upon remand to the Commissioner on May 16, 2018, this Court's most recent remand order, contained the following direction: The Commissioner must perform further consideration in light of the Appeals Council's October 13, 2015, remand order (the Appeals Council's first remand order). (Doc. 8-18, at 45). Specifically, the Court directed the Commissioner to answer two questions which were raised by the Appeals Council in its review of ALJ Myers's decision: First, why ALJ Guida came to the conclusion that Dr. Michalek's December 2012 opinion was that no physical examination or diagnostic testing by the Neurology Center noted any objective medical abnormalities, especially considering that Dr. Michalek referred Pearson to Dr. Royer for diagnostic testing;[4] and second, why he did not address Dr. Michalek's opinion that Pearson required intermittent naps during working hours for his safety due to his narcolepsy, and that he exhibited a poor

---

[4] The undersigned specifically cited as problematic ALJ Guida's failure to address that Dr. Michalek referred Pearson to Dr. Royer for a neuropsychological evaluation. (Doc. 8-18, at 44).

response to medication. (Doc. 8-18, at 44). In its October 13, 2015, remand order, the Appeals Council gave the ALJ discretion to request additional evidence or clarification from the treating and non-treating sources as deemed appropriate. (Doc. 8-18, at 42). If ALJ Guida did not answer these questions, then, once again, he has committed legal error. *See Sullivan*, 490 U.S. at 886.

In his February 8, 2019, decision, though he cites records from Dr. Michalek which lack objective medical findings, ALJ Guida again failed to address that Dr. Michalek referred Pearson to Dr. Royer. (Doc. 8-17, at 13-14). The fact that Dr. Michalek referred Pearson to a neuropsychological evaluation "following reports of cognitive difficulties and a diagnosis of narcolepsy," renders ALJ Guida's conclusion that Dr. Michalek's records contain no objective findings to support her opinion that Pearson was unable to work, as well as that "Dr. Michalek indicated no treatment findings on her part that supported such a significant change from her opinion letter of January 12, 2009," at the very least, questionable.[5] (Doc. 8-9, at 41; Doc. 8-17, at 13); *see Bryan v. Commissioner of Social Sec.*, 383 F. App'x 140, 146 (3d Cir. 2010) (indicating that a doctor's referral for treatment is significant); *Bruni v. Astrue*, 773 F. Supp. 2d 460, 474 (D. Del. 2011) (primary care physician's lack of referral to a mental health specialist signified substantial evidence for ALJ's determination that depression was not a severe impairment). Additionally, treatment for narcolepsy is largely limited to stimulants and naps, both of which Dr. Michalek had already prescribed. *See* National Institute of Neurological Disorders and Stroke, *Narcolepsy Fact Sheet: What treatments are available?* (Mar. 16, 2020), https://www.ninds.nih.gov/Disorders/Patient-Caregiver-

---

[5] Dr. Michalek's 2009 letter stated that Pearson was able to perform all essential duties and responsibilities except travelling more than four hours.

Education/Fact-Sheets/Narcolepsy-Fact-Sheet#3201_7.

ALJ Guida addressed Dr. Michalek's December 20, 2012, opinion that Pearson "requires intermittent naps during his working hours for his safety," by citing Dr. Michalek's records noting that Pearson required "only" one nap for one hour in the afternoon, as well as Pearson's 2015 report that he napped once a day for 15-20 minutes. (Doc. 8-17, at 14). ALJ Guida determined that this evidence did not correspond to Dr. Michalek's 2012 opinion, therefore, that opinion was discounted. (Doc. 8-17, at 14). However, despite this evidence of, at the very least, Pearson's need to nap for 15-20 minutes once per day, ALJ Guida did not include any limitation relating to naps in Pearson's RFC.[6] (Doc. 8-17, at 10). It is well-held law that an RFC assessment must include all of a plaintiff's documented impairments. *Morder v. Colvin,* 216 F. Supp. 3d 516, 528 (M.D. Pa. 2016) (citing *Chrupcala v. Heckler,* 829 F.2d 1269, 1276 (3d Cir. 1987). Because ALJ Guida again failed to follow the directions of this Court, and also because Pearson's uncontradicted need to nap for at least 15-20 minutes was not included in his RFC, ALJ Guida's decision must be reversed. *See Sullivan*, 490 U.S. at 886; *Morder*, 216 F. Supp. 3d at 528.

B.    <u>PEARSON SHALL BE AWARDED BENEFITS.</u>

This matter has been brought before an ALJ on three different occasions, has been remanded by the Appeals Council twice, and has been dismissed and remanded by this Court once on the Defendant's motion and once on the merits. At this point, the Court must consider whether remand is once again appropriate, or whether benefits should be awarded.

---

[6] At no point does ALJ Guida find evidence that Pearson has no need to nap during his work day. (Doc. 8-17, at 10-15).

The statute which defines the Court's role in reviewing Social Security disability determinations states, "The court shall have power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing." 42 U.S.C. § 405 (g). The Court has the power to simply award benefits. *Podedworny v. Harris*, 745 F.2d 210, 221 (3d Cir.1984). That power has been limited by the Third Circuit Court of Appeals as follows:

> The decision to direct the district court to award benefits should be made only when the administrative record of the case has been fully developed and when substantial evidence on the record as a whole indicates that the claimant is disabled and entitled to benefits. When faced with such cases, it is unreasonable for a court to give the ALJ another opportunity to consider new evidence concerning the disability because the administrative proceeding would result only in further delay in the receipt of benefits.

*Podedworny*, 745 F.2d at 221-22 (internal citations omitted).

As stated by the Third Circuit, two restrictions preclude the district court from awarding benefits: The administrative record must be fully developed, and substantial evidence on the record as a whole must indicate that the claimant is disabled and entitled to benefits. *Podedworny,* 745 F.2d at 221. Additionally, cases which have been ongoing for a considerable amount of time are more likely to result in an award of benefits rather than further proceedings and consideration. *Diaz v. Berryhill*, 388 F. Supp. 3d 382, 391 (M.D. Pa. 2019). The court in *Diaz* undertook a survey of Third Circuit precedent to determine the point at which courts will award benefits and found that "administrative delays of five years or more in cases involving one or two prior remands have constituted excessive delays triggering consideration of an award of benefits in lieu of a remand." *Diaz,* 388 F. Supp. 3d at 391.

Here, Pearson first filed for administrative benefits on February 13, 2012, and filed his first complaint in this Court on July 22, 2014. (Doc. 8-4, at 2-10; Doc. 8-11, at 24-35). Eight

years have passed since Pearson's application, and more than five and a half years have passed since his first complaint. Additionally, this is the Court's third remand of Pearson's case, the first being on motion of the Commissioner. (Doc. 8-11, at 36-42; Doc. 8-18, at 45). Every remand has been due to the Commissioner's failure to follow remand directions or to fully develop the record; the claimant has not been the cause of any delay. The administrative delay in this case favors an award of benefits in lieu of a remand. *See Diaz*, 388 F. Supp. 3d at 391.

In addition to the delay, benefits may only be awarded if the administrative record is fully developed, and substantial evidence on the record as a whole indicates Pearson is disabled and entitled to benefits. *Podedworny,* 745 F.2d at 221. This means that any of a number of requirements will lead to the award of benefits: "If the court finds the record to be 'extensive and well developed;'" "if the court concludes that the medical opinion evidence in a case has been fully developed;" if the "extensive medical record, wrongly rejected by the ALJ, is substantial evidence that [a claimant is disabled];" "or when treatment records, coupled with a treating source's opinions over several years, indicates that the plaintiff is unable to maintain a normal, regular work schedule." *Diaz*, 388 F. Supp. 3d at 391-92 (internal citations omitted).[7]

To determine whether benefits should be awarded, the Court must examine Pearson's medical record to determine whether it is fully developed and indicates Pearson is disabled

---

[7] The Court should note that Pearson was found not disabled and capable of performing past relevant work at all points during the relevant period, meaning Pearson bears the burden of proof to show he was unable to engage in his past work and the Commissioner bears the burden of proof to show other work exists in the national economy which Pearson is capable of performing. *See Diaz*, 388 F. Supp. 3d at 392 (holding that the procedural posture of the case should be identified) (citing Mason v. Shalala, 994 F.2d 1058, 1064 (3d Cir. 1993) (identifying the burdens of proof)).

and entitled to benefits. *See Podedworny,* 745 F.2d at 221. The record begins on August 28, 2008, with a note by Pearson's treating neurologist, Dr. Michalek, stating, in relevant part, that Pearson suffers from narcolepsy and that he needs Adderall. (Doc. 8-9, at 8). Dr. Michalek continued writing Adderall prescriptions through the end of 2008 and, on January 12, 2009, wrote a letter stating that Pearson takes Adderall for his condition and is able to perform all essential duties and responsibilities except that he requires assistance with driving if more than four hours and his job should allow him to get up and walk around if necessary. (Doc. 8-9, at 7). This letter was written almost two and a half years before Pearson's alleged onset date. *See* (Doc. 8-6, at 2-8) (noting the alleged onset date of June 30, 2011).[8]

Dr. Michalek continued writing Adderall prescriptions throughout 2009 and 2010. (Doc. 8-9, at 6, 9). On August 4, 2010, Dr. Michalek wrote that Pearson was doing well on his medications and that he was taking one-hour naps in the afternoon. (Doc. 8-9, at 9). The Adderall prescription continued through 2011, and on August 4, 2011, approximately one month after the alleged onset date, Dr. Michalek wrote that Pearson had good days and bad days, and that he continued to nap for one hour in the afternoon. (Doc. 8-9, at 5).

On February 1, 2012, Pearson was examined by Stanley Schneider, Ed.D. ("Schneider") after being referred for a clinical psychological disability evaluation by the Pennsylvania Department of Labor and Industry. (Doc. 8-9, at 25-27). Pearson's alleged condition at this evaluation was narcolepsy. (Doc. 8-9, at 27). Schneider reported that in the

---

[8] Opinions from before the alleged onset date are generally given more than limited weight only if they are consistent with the record from the period at issue. *Clay v. Saul,* 2020 WL 583010, at *3 (M.D. Pa. 2020); *Moon v. Berryhill,* 2018 WL 7002038, at *10 (M.D. Pa. 2018); *Batdorf v. Colvin,* 206 F. Supp. 3d 1012, 1015 n. 1 (M.D. Pa. 2016) ("Plaintiff notes the ALJ correctly gave this opinion limited weight because it was authored prior to Plaintiff's alleged onset date.").

afternoon, after 1:00 or 2:00 pm, Pearson would nap for one to one and a half hours and then go to work. (Doc. 8-9, at 28). Pearson also reported to Schneider that "if he is involved with something he will not fall asleep during the day." (Doc. 8-9, at 28). As Pearson reported daily napping for at least one hour in the afternoon followed by work, the undersigned interprets this evidence as meaning Pearson would not fall asleep as long as he was involved with something but also that he required a nap of at least one hour every afternoon. (Doc. 8-9, at 28). Schneider noted that Pearson reported no impairments, restrictions, or limitations in his activities of daily living, although his daily naps appear to directly contradict this note. (Doc. 8-9, at 31). Schneider made no other observations regarding Pearson's need for sleep. (Doc. 8-9, at 25-34).

On April 30, 2012, Pearson underwent a neuropsychological evaluation by Dr. Royer. (Doc. 8-9, at 41). Pearson was referred to Dr. Royer by his treating neurologist, Dr. Michalek. (Doc. 8-9, at 41). Dr. Royer noted that Pearson "was referred for an evaluation of his current neurocognitive status following reports of cognitive difficulties and a diagnosis of narcolepsy." (Doc. 8-9, at 41). This note indicates that Dr. Michalek perceived increased abnormality in Pearson's status at this time. Pearson reported to Dr. Royer that "he is not sure what his sleep will do," making it so he cannot really travel, and his ability to drive depends on the time of day and how he is feeling. (Doc. 8-9, at 42). Royer's report shows a decline in Pearson's ability, as Pearson "finds himself looking for things more than he used to," and "use[d] to read a lot but now he can only read for 10-15 pages at a time, and it takes him longer to read things." (Doc. 8-9, at 42). Upon performing his evaluation, Dr. Royer opined that Pearson "has significant impairment on tests that measure novel problem solving skills, organization and planning. This difficulty impacts some aspects of memory and

attention as well." (Doc. 8-9, at 45). Dr. Royer concluded that "the constellation of symptoms exhibited and reported suggests that [Pearson] would have considerable difficulty in the area of full time competitive employment," and recommended psychotherapy and psychiatric follow-up. (Doc. 8-9, at 46). Dr. Royer's report indicates that Pearson's cognitive abilities had deteriorated to an extent, that Dr. Michalek found Pearson was experiencing increased difficulty, and that Pearson's memory and attention were impaired. It is also notable that Pearson's need for sleep was unpredictable. (Doc. 8-9, at 42).

Approximately one week later, on May 7, 2012, Pearson was examined by Dr. Herbert Blumenfeld. (Doc. 8-9, at 47). Dr. Blumenfeld opined that Pearson's "symptoms lack all the requirements of [narcolepsy]," the first medical provider to make such finding. (Doc. 8-9, at 47). Dr. Blumenfeld also concluded that Pearson could function fully with limited exposure to hazards. (Doc. 8-9, at 47). ALJ Guida determined that Pearson did, in fact, suffer from narcolepsy, casting immediate doubt on Dr. Blumenfeld's credibility. (Doc. 8-17, at 7). Additionally, Dr. Blumenfeld stated that there were no medical source conclusions about Pearson's limitations or restrictions which were significantly different from his findings, a statement that is clearly inaccurate given Pearson's long-standing diagnosis of narcolepsy and Dr. Royer's opinion from one week earlier that Pearson would have "considerable difficulty in the area of full time competitive employment." (Doc. 8-9, at 54); *see* (Doc. 8-9, at 8, 46). In the space provided for an explanation for the reason why significantly different medical conclusions were not supported by the evidence on file, Dr. Blumenfeld gave no answer. (Doc. 8-9, at 54).

On August 13, 2012, Dr. Michalek and Jane Wenger, CRNP, both members of Neurology Center, P.C., opined that "[Pearson's] symptoms suggest that he would have

considerable difficulty in the area of fulltime competitive employment." (Doc. 8-9, at 57). They stated that Pearson's narcolepsy "affects his ability to drive any distances that he may need for transporting himself to work," and that despite medication his sleep/wake schedule was disrupted. (Doc. 8-9, at 57). They also stated that they trusted Dr. Royer's neuropsychological evaluation. (Doc. 8-9, at 57). At this point, Dr. Michalek had been treating Pearson for at least four years. (Doc. 8-9, at 8, 57).

An MRI was performed on Pearson's brain on August 24, 2012, again on referral from Dr. Michalek. (Doc. 8-9, at 63). Dr. Albert Porter, of Pinnacle Health, reviewed and interpreted the MRI. (Doc. 8-9, at 63). The MRI showed various abnormalities and Dr. Porter diagnosed Pearson with nonspecific foci of abnormal white matter signal. (Doc. 8-9, at 63). Though Dr. Porter did not refer to Pearson's narcolepsy in his interpretation, recent research suggests that abnormal white matter corresponds to narcolepsy. Yun K. Park, Oh-Hun Kwon, Eun Yeon Joo, *White matter alterations in narcolepsy patients with cataplexy: tract-based spatial statistics*, 25 J. Sleep Research 181 (2016). This examination supports the well-documented diagnosis of narcolepsy, though has no real bearing on Pearson's functional limitations.

On December 11, 2012, Dr. Royer wrote a letter confirming that at that point he still believed, based on the results of Pearson's neuropsychological examination as well as Pearson's reported medical history, that Pearson would have difficulty maintaining competitive employment. (Doc. 8-9, at 65). Another letter was written by Dr. Michalek on December 20, 2012, stating that Pearson had a "known diagnosis of narcolepsy, restless leg syndrome and periodic leg movements in sleep." (Doc. 8-9, at 67). Dr. Michalek went on to outline Pearson's treatment history, which started with him presenting to her office in 2003 and included the subsequent diagnosis of narcolepsy confirmed by daytime sleep testing.

(Doc. 8-9, at 67). As for current effects, Dr. Michalek opined that Pearson's attention and concentration were impaired despite medication. (Doc. 8-9, at 67). Dr. Michalek importantly wrote, "Based on his medical condition and poor response to medication, [Pearson] requires intermittent naps during his working hours for his safety." (Doc. 8-9, at 67). Dr. Michalek described Pearson's sleep attacks as "irresistible," and stated that Pearson "was encouraged to continue his medications, maintain a regular sleep/wake schedule, and take several naps in addition to his ongoing treatment." (Doc. 8-9, at 67).

On June 17, 2013, Pearson was seen for a blood pressure check and his narcolepsy was not addressed. (Doc. 8-16, at 28). On November 19, 2014, Pearson was seen for a cardiac condition, and it was noted in the record that he was being treated for narcolepsy by a neurologist. (Doc. 8-16, at 16). On December 22, 2014, Pearson was seen for a check on the medicines he was taking, and Dr. Lisa Davis noted he was "more sleepy but also has narcolepsy." (Doc. 8-16, at 20). On May 8, 2015, and May 27, 2015, Pearson was seen for blood pressure checks, and his narcolepsy was addressed only to the extent that it was an "active problem." (Doc. 8-16, at 7, 11). On October 27, 2015, Pearson was seen by Yvonne Nguyen, PA-C, ("Nguyen"), who reported that Pearson's hypersomnia was resolved with Adderall, that Pearson naps once per day for 15-20 minutes, and that Pearson denied dozing. (Doc. 8-22, at 61).[9]

On February 24, 2016, Pearson again saw Dr. Michalek after presenting with "history of severe daytime sleepiness, tiredness despite taking Adderall on regular basis." (Doc. 8-23, at 21). Dr. Michalek wrote, "Patient was evaluated by neuropsychologist on several

_____

[9] Additionally, in late 2017 and early 2018, Pearson underwent cardiac and blood tests, which bore no relevance on his ability to function due to narcolepsy. (Doc. 8-22, at 3-7).

occasions, who concur with opinion that based on evaluation, reported medical and work history that patient would have considerable difficulty maintaining the requirement of proposed jobs."[10] (Doc. 8-23, at 21). Dr. Michalek then indicated that Pearson's sleep attacks were irresistible, that he responded poorly to medications, and that he was unable to maintain competitive employment at that time. (Doc. 8-23, at 21). Dr. Michalek noted that Pearson's symptoms included excessive daytime sleepiness. (Doc. 8-23, at 27).

Finally, Pearson testified before ALJ Myers on November 21, 2012, and on February 12, 2016, and before ALJ Guida on December 17, 2018. (Doc. 8-2, at 65; Doc. 8-10, at 28; Doc. 8-17, at 41). At his hearing in November 2012, Pearson testified that he needs to take naps during the day, specifically one to two in the morning and another one to two in the afternoon especially after eating. (Doc. 8-2, at 70). Pearson also testified that at that time he could easily fall asleep while in the middle of a conversation and that, though concentrating, he will just fall asleep, though he most often feels it coming on and excuses himself to rest. (Doc. 8-2, at 71-72). Pearson's ability to drive long distances varied considerably; sometimes he could drive for five hours at once, sometimes he could drive for 30-45 minutes before sleep washed over him. (Doc. 8-2, at 73).

Pearson's wife, Linda Pearson ("Mrs. Pearson"), testified that she did not think Pearson could work full-time because he required many naps to function at home, he had the ability to concentrate for only twenty minutes at a time, and his short-term memory was

---

[10] It is worth noting that the nurse's note for this visit indicated Pearson wished to "clear with [Dr. Michalek] that it is ok for him to perform the [jobs presented by the Commissioner]." This language signals that Pearson was expecting to be able to work and was looking for Dr. Michalek to confirm that expectation (which she did not). (Doc. 8-23, at 28).

impaired. (Doc. 8-2, at 78). She stated that, "it's just impossible for him to one, be in meetings, two, do the work that he could do without falling asleep in the middle of a meeting." (Doc. 8-2, at 86). At that time, Pearson would drive about ten minutes to get to work. (Doc. 8-2, at 82). The picture Mrs. Pearson painted was one of unexpected and frequent sleep attacks which Pearson could not resist. (Doc. 8-2, at 79-80). He would fall asleep in the middle of a television program they loved when he had slept for four hours that afternoon, but also, "like three times a year," would be up until eleven after not having had a nap. (Doc. 8-2, at 83-84). As for treatment, Mrs. Pearson testified that it was largely ineffective. "There's no real pill. There's only different, different things to try to hold it back." (Doc. 8-2, at 81).

The vocational expert at this hearing testified that an individual at Pearson's age who could perform sedentary, light, and medium work, but could not be exposed to hazards and could not drive, could perform work as a hand packager, as a press feeder, and as a final assembler. (Doc. 8-2, at 90). These jobs would include a 30-minute lunch, one 15-minute break before lunch and one after lunch, and two unscheduled five-minute breaks for water or restroom use. (Doc. 8-2, at 90). If an individual with these limitations required two 45-minute breaks to nap during the course of the day, no positions would be available. (Doc. 8-2, at 90-91).

On February 12, 2016, Pearson appeared before ALJ Myers a second time, after his case had been remanded. (Doc. 8-10, at 28). At this time, Pearson testified that he still suffered from narcolepsy, averaging four to six hours of sleep per night and napping two or three times during the day – including occasionally "fall[ing] asleep without purpose" – to deal with it. (Doc. 8-10, at 31-32). At this hearing, Pearson testified that he was "separated" from every job he attempted during the relevant work period. (Doc. 8-10, at 32). Approximately two

years after his narcolepsy diagnosis, he was required to take a 30 percent pay cut and a different job with Rite-Aid, where he had been for 27 years. (Doc. 8-10, at 33). In 2008, he was let go from that employer due to 'reorganization,' though Pearson felt his high pay for his position as well as his high medical costs were factors. (Doc. 8-10, at 33). Pearson subsequently worked for a janitorial service where he was fired for inadvertently leaving a key in the lock of a door due to a lapse in concentration, as well as for Home Depot where he was fired for forgetting that he had left a bag of cash underneath his cash register. (Doc. 8-10, at 34-35).

At this hearing, the vocational expert testified that a typical employer would give "a ten to 15-minute break midway through the first half of the shift, a similar break midway through the second half, a 20- to 30-minute break mid shift, and then one or two five to ten-minute drink or restroom breaks that are generally unscheduled." (Doc. 8-10, at 42). The vocational expert also testified that the average employer would tolerate one day of absence per month, while Pearson testified that there are three or four days per month which are "bad," where he is unable to get out of bed, unable to think clearly, and unable to concentrate. (Doc. 8-10, at 43-45).

Mrs. Pearson testified that Pearson sleeps the whole day at times, where he only gets up for lunch and dinner. (Doc. 8-10, at 46). She also testified that he was very forgetful and he was hard to talk to because he would fall asleep in the middle of conversation. (Doc. 8-10, at 46). Again, Mrs. Pearson indicated that it was impossible to know what to expect, as "I never know what person is going to wake up. I mean, kind of like what he's going to be like, whether the medicine is going to work really well, or not so well." (Doc. 8-10, at 46). On the three or four "bad" days per month, Mrs. Pearson testified that Pearson is "just not there,"

and that "it's like when you first wake up and you never quite get out of that, I'm waking up and I'm kind of dopey. So that – he's just basically not there. Well he's there physically, but he's not there." (Doc. 8-10, at 47).

Finally, Pearson testified before ALJ Guida on December 17, 2018. (Doc. 8-17, at 39). At this hearing, Pearson testified that he still suffered from narcolepsy and that he still received treatment from Dr. Michalek and her neurology group. (Doc. 8-17, at 43). Since 2011, Pearson's narcolepsy had gotten worse, he said, in that he now needed to take two to three naps per day of one to one and a half hours, while in the past he required only one nap of half an hour per day. (Doc. 8-17, at 44). Of the hypotheticals given to the Vocational Expert, only two 15-minute breaks, one midway through the first half of an eight-hour workday and one midway through the second half of an eight-hour workday, would be allowed. (Doc. 8-17, at 49). Upon questioning from Pearson's attorney, the Vocational Expert confirmed that an employer would not tolerate the amount of naps Pearson testified he needed. (Doc. 8-17, at 49).

The medical evidence, opinions, and the testimony of the Pearsons, taken together, overwhelmingly show that during the period at issue Pearson has been unable to efficiently and confidently operate in a work environment without, at minimum, 15-20 minutes of permitted napping. For much of the time at issue, Pearson's ability to stay awake would vary considerably by the day, with no way of knowing how his condition would affect him when he would wake up in the morning. Dr. Michalek, Pearson's treating neurologist, wrote him a prescription for Adderall throughout the period at issue. (Doc. 8-9; Doc. 8-16; Doc. 8-23). In January 2009, Dr. Michalek opined that Pearson could work with only minimal driving limitations, however this was more than two years before the alleged onset date. (Doc. 8-6, at

2-8; Doc. 8-9, at 7). Dr. Michalek wrote that Pearson needed naps of one hour in the afternoon in August 2010 (while stating he was doing "well" on his meds), and needed one-hour afternoon naps in August 2011 as well. (Doc. 8-9, at 5, 9). In April 2012, Dr. Michalek referred Pearson to a neuropsychological evaluation "following reports of cognitive difficulties," indicating his condition had worsened. (Doc. 8-9, at 41). In August 2012, Dr. Michalek opined that Pearson would have "considerable difficulty" with fulltime employment – rendering her 2009 opinion that Pearson was able to work inconsistent with the period-at-issue evidence – due to the narcolepsy disrupting his sleep/wake schedule. (Doc. 8-9, at 57). Four months later, in December 2012, Dr. Michalek opined that Pearson's condition, including attention and concentration impairments and "irresistible" sleep attacks, necessitated intermittent naps during working hours.[11] (Doc. 8-9, at 67). In February 2016, Dr. Michalek again opined that Pearson would be unable to maintain competitive employment. (Doc. 8-23, at 21). The evidence from Dr. Michalek, Pearson's treating neurologist, shows that Pearson required naps throughout the period at issue, and that the irresistible nature of Pearson's sleep attacks made full-time employment difficult. (Doc. 8-9, at 5, 9, 41, 57, 67; Doc. 8-23, at 21).

In April 2012, Dr. Royer's neuropsychological evaluation evinced a decline in Pearson's condition, and the unpredictable nature of the condition and an array of symptoms would make full-time employment "considerabl[y] difficult[]." (Doc. 8-9, at 46). Eight months later, in December 2012, Dr. Royer's interpretation of Pearson's medical history

---

[11] Dr. Michalek also noted that daytime sleep testing led to Pearson's narcolepsy diagnosis in 2003. (Doc. 8-9, at 67).

together with the results of his examination led him to believe that Pearson would still have difficulty maintaining competitive employment. (Doc. 8-9, at 65).

In August 2012, an MRI of Pearson's brain showed abnormal white matter signal, a finding which corresponds to narcolepsy according to recent research. (Doc. 8-9, at 63); *see* Yun K. Park, Oh-Hun Kwon, Eun Yeon Joo, *White matter alterations in narcolepsy patients with cataplexy: tract-based spatial statistics*, 25 J. Sleep Research 181 (2016). From 2013 through 2014, Pearson was seen for various medical purposes unrelated to his narcolepsy, though it was frequently noted that narcolepsy was an active issue that was being treated by a neurologist. (Doc. 8-16, at 7, 11, 16, 20, 28). In October 2015, it was reported that Pearson's hypersomnia was "resolved" with Adderall, though he still required a 15-20 minute nap once per day. (Doc. 8-22, at 61).

In February 2012, Pearson reported to Schneider that he required naps in the afternoon of one to one and a half hours, though Schneider noted that Pearson's activities of daily living were not restricted, limited, or impaired. (Doc. 8-9, at 28, 31). In May 2012, Dr. Blumenfeld opined that Pearson did not suffer from narcolepsy and that he could fully function with limited exposure to hazards. (Doc. 8-9, at 47). Dr. Blumenfeld also stated that there were no medical source conclusions about Pearson's limitations or restrictions which were significantly different from his findings, a statement that was clearly false in light of Dr. Michalek's 2011 note that Pearson required one-hour afternoon naps and Dr. Royer's opinion from one week prior that full-time employment would be considerably difficult. (Doc. 8-9, at 54); *see* (Doc. 8-9, at 8, 46). Additionally, ALJ Guida concluded that Pearson suffered from narcolepsy, directly contradicting Dr. Blumenfeld's conclusion on that issue. (Doc. 8-17, at

7). Dr. Blumenfeld's opinion was the only evidence casting doubt on Pearson's ability to work without at least a 15-20 minute nap once per day.

Pearson's and Mrs. Pearson's testimony at the hearings before the ALJ's show that Pearson's need for sleep was unpredictable and varied by the day, that he would be overcome with irresistible sleep even while attempting to concentrate and interact with his surroundings, and that he required two to four naps during the workday in 2012, two to three naps during the day in 2016, and two to three naps during the day in 2018. (Doc. 8-2, at 70-81; Doc. 8-10, at 31-47; Doc. 8-17, at 44). This testimony was not contradicted by medical evidence, therefore it is deserving of great weight. *See Voorhees v. Colvin*, 215 F. Supp. 3d 358, 380 (M.D. Pa. 2015). According to the testimony of the Vocational Experts at each of these hearings, the longest break allowed by an employer outside of lunch – which Pearson would of course need to eat – would be fifteen minutes. (Doc. 8-2, at 90; Doc. 8-10, at 42; Doc. 8-17, at 49).

The nature of Pearson's narcolepsy rendered the condition disabling through the period at issue. Spontaneous sleep attacks which may arise "in the midst of conversation, while entertaining company, and once, while driving a car," make it "difficult to conceive of any setting where plaintiff could be gainfully employed." *Boeltz v. Bowen*, 648 F.Supp. 753, 756 (W.D. Pa. 1986). "It is [] difficult to conceive of any employer tolerating an employee who falls asleep on the job two to four times a day, without warning and without control over his sleeping habits." *Boeltz*, 648 F.Supp. at 756. Besides Dr. Blumenfeld, whose inaccuracies cast doubt on his credibility, no medical professional contradicted Pearson's need to nap a minimum of 15-20 minutes per day. As the Vocational Experts' testimony through the three administrative hearings was that any break of more than 15 minutes would not be allowed by an employer, there is substantial evidence to support Pearson's inability to work full-time due

to his narcolepsy. The opinion of Dr. Michalek, Pearson's treating source throughout the six-year period at issue, indicated that Pearson was unable to maintain a work schedule without the need for unpermitted naps. Throughout this time, Pearson was prescribed Adderall. Stimulants, naps, and lifestyle changes are the only treatment options for an individual with narcolepsy. National Institute of Neurological Disorders and Stroke, *Narcolepsy Fact Sheet: What treatments are available?* (Mar. 16, 2020), https://www.ninds.nih.gov/Disorders/Patient-Caregiver-Education/Fact-Sheets/Narcolepsy-Fact-Sheet#3201_7. The evidence, the testimony, and the Vocational Experts' opinion that Pearson's need for naps would not be allowed indicate that a normal and regular work schedule would not be possible. Thus, benefits should be awarded. *See Diaz*, 388 F. Supp. 3d at 391-92.

## V. CONCLUSION

The decision made by the Court today is one that should be made on only rare and extraordinary occasions. To award or not to award disability benefits is a choice that presumptively lies with the Commissioner. However, "finality and fairness are cardinal virtues of our legal system," and at this point, after waiting several years and experiencing multiple faulty decisions, Pearson is entitled to the application of those virtues. *See Diaz*, 388 F. Supp. 3d, at 399. Judgment shall be entered in favor of the plaintiff and the Commissioner shall be directed to award benefits in this case.

An appropriate Order follows.

Dated: April 14, 2020

*s/ Karoline Mehalchick*
**KAROLINE MEHALCHICK**
**United States Magistrate Judge**